STATE OF SOUTH CAROLINA, BY W. A. BARBER, AS ATTORNEY GENERAL, AND O. C. SIRES v. L. E. PARLER, STYLING HIMSELF COUNTY TREASURER OF DORCHESTER COUNTY.

1. COUNTIES—COUNTY SEAT—CONTTITUTION.—Secs. 1 and 2 of art. VII. of Constitution of 1895 do not require a two-thirds vote for county seat of new county, but its name and location may be determined by majority vote.

2. IBID.—IBID.—IBID.—The ordering and holding of more than one election to determine the name and location of the county seat for a new county is not in violation of art. VII. of Constitution of 1895.

Action in the original jurisdiction of this Court on the following complaint: The plaintiffs, complaining of the defendant, by leave of Hon. R. C. Watts, Circuit Judge, first had and obtained, allege:

First. That the plaintiff, O. C. Sires, is a citizen of the State of South Carolina, and a taxpayer and resident of said State, within the area proposed for the new county hereinafter described.

Second. That on or about the        day of        , 1896, one-third of the qualified electors within the area of a certain section of Berkeley County and of a certain section of Colleton County, in this State, petitioned the governor of this State for the creation of a new county, to be known as Dorchester, proposed to be formed by cutting off for said

purpose the said area; and in said petition the boundaries of the proposed new county, the said proposed name, "Dorchester," the area, the taxable property, and other particulars are set forth.

Third. That thereupon, on the 9th day of November, 1896, the governor of the said State, declaring that he did so in compliance with the requirements of an act of the General Assembly entitled "An act to provide for the formation of new counties," &c., approved March 9th, 1896, ordered as follows: That an election in the said territory to be cut off for the said new county, on the 15th day of December, 1896, be held, in accordance with the requirements of said act, at which election the electors shall vote "Yes" or "No" upon the question of creating the new county, and upon the name and county seat of the proposed new county.

Fourth. That, pursuant to said order, an election was held on the said 15th day of December, 1896, at the polling places in said area. That at such election more than two-thirds of the qualified electors voting at such election voted "Yes" upon the question of creating such new county. That at such election 1,080 votes were cast upon the question of the name of the new county. That of the said votes, 807 votes bearing the words "Dorchester: yes," were cast; 59 votes bearing the words "Dorchester: no," were cast; 184 votes bearing the words "Edisto: yes," were cast, and 30 votes bearing the words "Edisto: no," were cast. That at such election 794 votes were cast upon the question of the county seat for the said proposed county. That of the said votes, 223 were cast in favor of Summerville, 368 were cast in favor of St. Georges, and 203 votes were cast in favor of Ridgeville—no place receiving two-thirds of the votes cast for the location of the county seat.

Fifth. That on the 23d of December, 1896, the governor of this State issued his proclamation, wherein he declared that two-thirds of the votes had not been cast for any of the proposed county seats at the election aforesaid; and, declaring that his action was in accordance with the

requirements of the act aforesaid, ordered an election. in the before mentioned area on the 2d of January, 1897; stating therein that, at such election, the qualified electors shall vote for a county seat. That, pursuant thereto, an election was held on said 2d of January, 1897, at the voting places in said area, on the question of a county seat for the proposed new county, at which election 1,124 votes of qualified electors were cast, of which 586 votes were in favor of St. George, 339 votes were in favor of Summerville, and 199 votes were in favor of Ridgeville as the location of the said county seat.

Sixth. That thereafter, to wit: on the 25th of February, 1897, an act entitled "An act to establish Dorchester County," which had been passed by the General Assembly of this State, was approved. That the said act, among other things, contains the following provisions: Section 1. Be it enacted by the General Assembly of the State of South Carolina, That a new judicial and election county, which shall be known as Dorchester County, is hereby formed, with the following boundaries, to wit: All that portion of Colleton County comprised in the townships of George, Koger, Carn, Burns, Givhans, Dorchester, and that part of Collins township in said county of Colleton lying north of the public road leading from Parker's Ferry, on the Edisto River, to a public landing, known as Lowndes' Landing, upon Rantowle's Creek; and all that portion of Berkeley County included within the following lines, to wit: From the intersection of the county line between Colleton and Berkeley Counties, with the run of Four Hole Creek, a straight line to a point upon Saw Mill Branch, one mile northeast of the South Carolina and Georgia Railroad; thence along said branch to the Colleton County line, and thence back to the starting point along the line of division between Colleton and Berkeley Counties.. Section 2. That L. A. Klauber, of St. Georges, T. Q. McAlhaney, of St. George's, R. L. Farrell, of Harleyville, D. E. Thrower, of Ridgeville, E. B. Fishburne, and Geddings Ilderton, of

14—52

Knightsville, and Roach Platt, of Delemars, are appointed commissioners to have the boundaries of said new county of Dorchester, as above indicated, surveyed and properly marked, as well as to designate and establish the particular site for public buildings, as hereinafter provided: Provided, That the county seat shall be decided by vote of the qualified electors in said county, at an election which shall be held in accordance with the law, by order of the governor, which election shall be held within thirty days after the approval of this act: Provided, further, That if, from any cause, said election shall not be held on the day mentioned, that then, and in such an event, the governor shall be, and is hereby, empowered to order another election at his discretion; and should the people at such election fail to determine upon the selection of such county seat, the governor shall be, and is hereby, authorized and empowered to call as many elections as may be necessary to determine upon the selection of such county seat; and the place receiving a majority of the qualified electors voting at such election or elections, shall be the county seat. * * *

Seventh. That the area of the said Dorchester County, as defined in said act, is the same area hereinbefore mentioned.

Eighth. That subsequent to the passage of said act, to wit: on the 24th of March, 1897, another election for the location of a county seat for said proposed county was held, pursuant to the requirements of said act, at which election 1,081 qualified voters of said area voted, and of the votes cast, St. George's received 648 votes, Summerville received 241 votes, and Ridgeville received 192 votes. And that thereupon the governor of this State, by proclamation of the 5th of April, 1897, called an election for senator and county officers for said county of Dorchester.

Ninth. On information and belief, that thereafter, on the 28th day of July, 1897, the defendant was commissioned by the governor of this State as county treasurer of said Dorchester county, and he has, since that time, and is now, holding and exercising the functions in all respects the same

as if said office legally existed and he was the lawful owner of the same.

Tenth. That the said act is unconstitutional and void: 1. In that it undertakes to establish a new county, and that the legislature was without power so to do, unless, among other things, two-thirds of the qualified electors within said area had before such establishment and at the same election at which the questions of creating said proposed new county and the name thereof had been properly submitted, had chosen a county seat; that two-thirds of said electors had not so voted at or before the said 25th February, 1897, nor have they so voted at any election either before or afterwards. And in undertaking so to act, the legislature acted in violation of art. VII., secs. 1 and 2, of the Constitution of this State. 2. That the Constitution of this State, in said sections, requires that the selection of a county seat shall precede the formation of a new county, and that such selection must be made by no less than two-thirds of the qualified votes of the area of the proposed new county uniting on the choice of a locality; that, on the contrary, the said act declares that the selection of a county seat shall be decided by a vote of a majority of said qualified electors. 3. That the said sections of the Constitution provide that the election for selecting the location of a county seat shall be held on the order of the governor. That said act itself undertakes to order the numerous elections therein provided for in this regard, or to command the governor to order the same, and is in conflict with the provisions of the Constitution of this State, art. I., sec. 14.

Wherefore, they pray that the said act be declared unconstitutional, null and void, and that the said office of county treasurer be held to be null and void, and that the said defendant has no authority to act in such capacity, and for such further relief as may be proper.

*Messrs. Lord & Burke*, for plaintiffs, cite: *Governor must appoint a treasurer for each legally constituted county:* Rev.

Stat., 317; 22 Stat., 595. *Act establishing Dorchester is unconstitutional:* Con. 1895, art. VII., secs. 1 and 2; Journal Con. Convention, 382, 396, 409, 716, 726. *The question of the lawful existence of the county can be made in quo warranto proceedings:* 7 Rich., 324; 38 Conn., 449; 10 Mass., 295; 24 N. Y., 86; 15 N. Y., 532; 55 N. Y., 50; 57 N. Y., 576; 25 Minn., 215; Code, 428, 430; 70 N. Y., 518; 55 N. W., 1072; 41 Mich., 647; 42 N. W., 687; 59 Mo., 59; 25 N. E., 121; 51 N. W., 613; 50 N. W., 832; 16 S. W., 872. *No voter is estopped from denying constitutionality of an act:* 38 Ohio St., 517; 3 Tenn. Rep., 300; 4 Id., 224; 13 Mich., 230; 116 Ill., 493.

*Messrs. Howell, Gruber & Rumph* and *Henderson Bros.*, for defendants, cite: *Act in question not unconstitutional:* Con. 1895, art. VII., secs. 1 and 2; 14 S. C., 195; 15 S. C., 592; 22 Stat., 64; Journal Con. Convention, 255, 382, 396, 409, 606, 716; 48 S. C., 152; 21 S. C., 375; 27 Vt., 142; 19 Wall., 673; 16 S. C., 34; 42 S. C., 231; 4 S. C., 420.

April 1, 1898. The opinion of the Court was delivered by

MR. JUSTICE POPE. This is an action brought in the original jurisdiction of this Court by the plaintiffs above named, having already received such consent to do so as required by law, to test the right of the defendant to hold the office of county treasurer of Dorchester County, in this State, because it is alleged that under the Constitution of this State, adopted in the year 1895, there is no such county as Dorchester County, and, consequently, no such office as that of its county treasurer. The complaint must be reported. The answer of defendant need not be reported.

When the complaint was read before this Court, the defendant interposed the oral demurrur that the complaint did not state facts sufficient to constitute a cause of action, in two particulars: *first*, because it is not alleged that the defendant usurped, intruded into or unlawfully holds or exercises any public office, civil or military; *second*, because

the complaint does not allege any facts showing that the act of the General Assembly creating Dorchester County is unconstitutional and void.

After a full hearing of the respective counsel, and after a patient investigation of the matters involved, this Court passed the following order (omitting the caption): "The Court having reached the conclusion that there is no ground for the relief prayed for in the petition, and it being important to the public interests that this conclusion should be announced without further delay; it is ordered, that the petition be dismissed. The reasons for this conclusion will be stated in an opinion to be hereinafter filed." Such being our conclusion, it only remains that the reasons therefor be now stated.

Counsel for the petitioner conceded that the defendant has been appointed by the governor to fill the office in question, and that he is exercising the duties thereof, but they contend that there is no such office as county treasurer of Dorchester County, for the reason that no such county as Dorchester County exists in this State, because the act of the General Assembly, passed on 25th February, 1896, was unconstitutional, and, therefore, void. We must, therefore, examine the constitutional provisions in question, and so much of the act of the General Assembly passed in 1896, and, it may be, of the act of the General Assembly passed in 1897, as relate to this subject, to see if petitioner is correct in his premises. Art. VII. (sections 1 and 2 thereof) of the Constitution of this State are as follows: "Section 1. The General Assembly may establish new counties in the following manner: Whenever one-third of the qualified electors, within the area of each section of an old county proposed to be cut off to form a new county, shall petition the governor for the creation of a new county, setting forth the boundaries and showing compliance with the requirements of this article, the governor shall order an election, within a reasonable time thereafter, by the qualified electors within the proposed area, in which election

they shall vote 'Yes' or 'No' upon the question of creating
said new county; and at the same election the question of
a name and a county seat for such county shall be submit-
ted to the electors.   Section 2.   If two-thirds of the qualified
electors voting at such election shall vote 'Yes' upon such
questions, then the General Assembly, at the next session,
shall establish such new county: *Provided*, No section of
the county proposed to be dismembered shall be thus cut
off without consent by a two-thirds vote of those voting in
such section, and no county shall be formed without com-
plying with all the conditions imposed in this article.   An
election upon the question of forming the same proposed
new county shall not be held oftener than once in four
years."   It is conceded that in the election ordered by the
governor under the condition prescribed, to wit: under a
petition signed by more than one-third of the citizens re-
siding within the territory of the proposed new county,
more than two-thirds of the voters voted for the establish-
ment of the new county, and for "Dorchester" as its name;
but because a two-thirds vote at such election, for the name
of a county seat, was not cast, therefore, one of the questions
was not answered by the voters, as required by the Consti-
tution.   It is well to notice that the words of the second
section, "and no new county shall be formed without com-
plying with all the conditions of this article," governs or
requires a two-thirds vote of the citizens affected, as to the
creation of such new county, but also section 3 requires that
no such county shall contain less than the 124th part of the
whole number of the inhabitants of the State, nor shall it
have less assessed taxable property than $1,500,000, as shown
by the last tax returns, nor shall it contain less area than 400
square miles; and also, that section 4 requires that no old
county shall be reduced to less area than 500 square miles,
to less assessed taxable property than $2,000,000, nor to a
less population than 15,000 inhabitants.   And also, section
5 provides that, in the formation of new counties, no old
county shall be cut within eight miles of its court house

building.   And also, by section 6 it is provided that all
new counties formed shall bear a just apportionment of the
valid indebtedness of the old county or counties from which
they have been formed.   In the case at bar, all the condi-
tions have been complied with, unless the choice by a two-
thirds vote at the first election of a county seat can be said
to be a condition in the article to the formation of the new
county, Dorchester.   Does the language itself of this article
require such a construction of its terms?   It is true, that
the word "questions" is plural, but may not this word
"questions" be construed, from the language itself, to mean
the question propounded to the several pieces of territory
which it was proposed should form the new county?   Each
had to vote separately.   It is equally certain that in the minds
of the Constitution builders—the delegates composing the
convention which framed the new Constitution—there was
present the idea that new counties would be made up of parts
of two or more counties; and, therefore, might not the word
"questions" be referable to the same question being pro-
pounded to several distinct pieces of territory, separately,
and thereby become "questions?"   It is to be noticed, also,
that while the copulative conjunction "and" is here used
to connect the matter of voting "yes" or "no," upon the
question of creating the new county, with the words, "at the
same election the question of a name and a county seat for
such county shall be submitted to the electors," the word
"also," importing "in like manner," is absent.   The peti-
tioner, however, submits that the language in the second
section, "If two-thirds of the qualified electors voting at
such election shall vote 'yes' upon such *questions,* then the
General Assembly, at the next session, shall establish such
new county," negatives any theorizing; that the language
of the Constitution needs no explanation, for its meaning
is so plain that it needs no interpretation.   Is this so?   How
could a vote for a name and a county seat be ascertained
by voting a ticket with "yes" or "no" on it?   It is sug-
gested that it could be so arranged on the ballots.   This

suggestion admits the necessity for resorting to something outside of the language employed in the Constitution itself to accomplish this result. It has been suggested at the bar that a resort to contemporaneous construction by the legislature will show what the Constitution means. While this is not recognized as of much value, except in cases of doubtful construction, yet it is admitted as one of the means to ascertain the meaning of doubtful terms. This is of value, too, because many of the members of the convention which framed the Constitution were also members of the next General Assembly, which assembled in less than one month after the Constitution went into effect, for the Constitution went into effect on 31st December, 1895, and the next General Assembly met on 15th January, 1896. By the act passed by that General Assembly, entitled "An act to provide for the formation of new counties, and the changing of county lines and county seats, and consolidation of counties," approved 9th March, 1896 (22 Stat., 64), in the fifth section, it is provided, "The General Assembly, at its next session, shall create such new county, if two-thirds of the qualified electors voting at such election *shall vote in favor of the establishment of such new county*, and if all the constitutional requirements for the formation of new counties have been complied with, of all of which such General Assembly must judge." By the language quoted, it is quite evident that the General Assembly thought the vote "yes" or "no," on the question of the establishment of the new county, was the meaning of the language in section 2 of art. VII. of our present Constitution, when it speaks of a two-thirds vote on the "questions" therein referred to. Likewise, in the act passed by the next General Assembly, as found in vol. 22 of Stat. at Large, 595, entitled "An act to establish Dorchester County," it is manifest from the provisions of that act that the judgment of the General Assembly was that the two-thirds vote was not necessary to establish a county seat; for in the second section of the act just cited, a majority vote in the election to determine a

"County Seat" was all that was required. Reference has also been made by both parties to this controversy, to the propriety of resorting to the journal of the Constitutional Convention to aid us in determining this matter. Mr. Cooley, in his work on Constitutional Limitations, * pages 66 and 67, speaks of this resort to such journal as very helpful. We have examined the journal in question, and our minds are impressed with the fact that, in the passage of the article in question by the convention, the word "question," in the second section of article VII., was in the singular, and that it was only changed to "questions" by the "committee on order, style and revision," by its amendment to that effect, which was adopted by the convention. We do not mean to say that the Constitution should not be read with the word "questions" in it. Such was the final act of the convention, and it must so stand; but we do mean to say that, in ascertaining to what vote the two-thirds vote is required to relate, it must be confined to the question of creating a new county out of an old county or old counties.

Again, it is suggested that the legislation had in relation to Dorchester County is unconstitutional and void, because it has attempted to enlarge the direct provisions of the Constitution, in sections 1 and 2 of article VII., by allowing a second and other elections to determine county seat, after the first election on that matter, which was held at the same time the question as to the creation of the new county was submitted to the electors residing in the territory affected thereby. We cannot accept this view. In the first place, the Convention speaks in the first section of article VII. of the General Assembly establishing new counties. Its only restrictions are set forth in the article, and do not negative the idea that the General Assembly, under its possession of general legislative power, may do other things than those enumerated in the article VII.; but it (the legislature) must not controvert, in letter or spirit, the provisions of the Constitution itself. All these matters have been frequently discussed by this

Court.    See *State* v. *Hayne*, 4 S. C., 420;  *State* v. *Columbia*, 6 S. C., 1; *Pelzer, Rogers & Co.* v. *Campbell,* 15 S. C., 592; *Ex parte Lynch,* 16 S. C., 34;  *Norton* v. *Bradham,* 21 S. C., 375;  *State ex rel.* v.  *City of Aiken,* 42 S. C., pp. 231, 243; *Delk* v. *Zorn,* 48 S. C., 152.

It follows, therefore, that the relief prayed for must be denied, our judgment to that effect having already been rendered herein.